IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Earl Thomas, III,
    Plaintiff,

v.    1:10cv245 (CMH/JFA)

Benjamin Ulep,
    Defendant.

MEMORANDUM OPINION

Earl Thomas, III, a Virginia inmate proceeding pro se, filed this action pursuant to 42 U.S.C. § 1983, alleging defendant violated his rights under the Eighth Amendment through deliberate indifference to his medical needs relating to sudden hearing loss. On July 23, 2010, defendant Benjamin Ulep filed a Motion for Summary Judgment, arguing that Thomas failed to exhaust his administrative remedies and that the claim of deliberate indifference is without merit. Thomas was given the opportunity to file responsive materials, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and has filed a response, addressing the exhaustion issue as well as defendant's arguments on the merits. For the reasons that follow, defendant's Motion for Summary Judgment will be denied. Thomas's Motion to Deny Motion for Summary Judgment (Docket # 39), which in legal effect is a reply, will be denied as moot.

I. Background

On March 11, 2008, Earl Thomas, III–then an inmate at Sussex II State Prison–submitted an Emergency Medical Grievance because he had suddenly lost hearing in his left ear, and also had a headache and a fever. See Compl.6, ECF No. 1. The emergency grievance was rejected because it "did not meet the definition of an emergency," and Thomas was instructed to submit a sick call request. See Compl.6, ECF No. 1. Thomas sent a sick call request to the medical

department on March 13, 2008, and Thomas was seen by Dr. Ulep the next day. See Compl.7, ECF No. 1. After examining Thomas, Dr. Ulep directed Thomas to take a decongestant and to return for a follow-up appointment on March 24, 2008. See Compl.7, ECF No. 1.

Thomas submitted another sick call request on March 21, 2008, explaining that his hearing had not improved despite his taking the decongestant that Dr. Ulep had prescribed. See Compl.7, ECF No. 1. Dr. Ulep saw Thomas on March 24, 2008 for a follow-up appointment. See Compl.7, ECF No. 1. Thomas asserts that Dr. Ulep did not want to send Thomas to see a specialist to evaluate his hearing loss, so Thomas filed informal complaints against Dr. Ulep. See Compl.7, ECF No. 1. Dr. Ulep states that he referred Thomas to a specialist to have his hearing checked on March 24, 2008, at which time Dr. Ulep also submitted a request for a referral form to seek approval to send Thomas to an off-site appointment. See Mem. in Support 6, ECF No. 20. Dr. Ulep received approval for the off-site appointment on March 28, 2007 and directed a member of his administrative staff to arrange an appointment at the Medical College of Virginia otolaryngology clinic ("MCV Clinic"). On April 9, 2008, Thomas was evaluated by an audiologist and an otorhinolaryngologist at the MCV Clinic, who told Thomas that he had nerve damage in his left ear and needed to be started on a course of steroids. See Compl.7, ECF No. 1. They also recommended that Thomas undergo blood and urine tests to determine what had caused the damage. See Compl.7, ECF No. 1. However, Dr. Ulep states that the physician who examined Thomas failed to send back the ENT Consultation Report containing his findings and recommendations for treatment, and that Dr. Ulep directed a member of his administrative staff to contact the MCV Clinic and ask them to fax the report as soon as possible. See Mem. in Support 6, ECF No. 20.

The Consultation Report diagnosed Thomas with sudden sensorineural hearing loss. See Mem. in Support 7, ECF No. 20. Thomas has filed documents concerning sudden sensorineural hearing loss (SSNHL), which are apparently written by experts in the field and which indicate that "[a] delay in treating this condition (2 weeks or more after the symptoms first began) will decrease the chance that medications might improve the hearing loss." See Additional Ex. 19, ECF No. 7. The Consultation Report recommended a tapering course of prednisone, as well as multiple blood tests, including complete blood count, rheumatoid profile, and Lyme's Disease test, and a magnetic resonance imaging test ("MRI") of Thomas's left ear, with a follow-up appointment at the MCV Clinic after the MRI was completed. See Mem. in Support 7, ECF No. 20. Dr. Ulep appears to claim that he did not know that tests were recommended until he received the Consultation Report on April 28, 2008. See Mem. in Support 7, ECF No. 20. However, as Thomas stresses in his Motion in Opposition to Defendant's Motion for Summary Judgment,[1] Thomas's medical charts contain a note dated April 10, 2008, which states:

> "Patient seen at ENT 4/09/08 and request for head MRI and mult. labs. Labs received but consult.[2] form left blank. P: P/S contact MCV-ENT Clinic and ask them to fax to us the ENT-MCV consultation report 4/09/08–we will need this to justify mult. test recommended."

---

[1] See Mot. in Opp'n to Mot. Summ. J. 11, ECF No. 33; see also Reply Mem. 14, ECF No. 36 ("A review of Dr. Ulep's statement in plaintiff [sic] medical file on April 10, 2008, Dr. Ulep does not claim to be unaware of the ENT findings and recommendations, he simply wants another document to justify multiple test [sic] recommended.").

[2] Petitioner argues that the "blank" Consultation Form was "un-signed." See Reply Mem. 13, ECF No. 36. Defendant asserts that "Dr. Ulep received these recommendations via a consultation form on [April 28, 2008]...[and w]ithout documentation from plaintiff's specialist, Dr. Ulep would not know what was required and would not be able to order the tests recommended." See Reply Mem. 2, ECF No. 32. Thus, it appears that the recommendations were not provided in documentary form until April 28, but defendant nowhere denies that he received the recommendations in some other form prior to that date.

See Opp'n to Summ. J.8, ECF No. 33. Thomas submitted an informal complaint on April 23, 2008, stating that the MCV Clinic had recommended blood work and medication and that he had not received either. See Additional Ex. 13, ECF No. 7. The response, which was dated April 28, 2008, stated "We're not going to order your labs until your other test have [sic] been completed." See Compl.7, ECF No. 1; see also Additional Ex. 10, ECF No. 7. Dr. Ulep did not order the recommended tests or start the course of predisone until April 28, some six weeks after Thomas submitted his first sick call request regarding his hearing loss. See Mem. in Support 7, ECF No. 20.

Dr. Ulep states that he started Thomas on a course of prednisone on April 28, 2008, see Ulep Aff. 4, ECF No. 20-4, and Thomas's medical files appear to indicate that he received a steroid taper sometime before October 29, 2008. See Mem. in Support, Ex. at 7, ECF No. 20-5. However, Thomas claims that he never received the steroids. See Compl.7, ECF No. 1. Thomas filed requests on July 2, July 5, and August 4, 2008, all stating that he had not received the medication the MCV Clinic had recommended for his "ear problem" and asking for immediate treatment. See Additional Ex. 22, ECF No. 7. Numerous tests were performed between April 28 and June 10, including an MRI and blood tests, and the results were normal. See Ulep Aff. 4-5, ECF No. 20-4.

Thomas was transferred from Sussex II State Prison to Nottoway Correctional Center on January 9, 2009. See Mem. in Support 9, ECF No. 20. He was first advised that he had permanent hearing loss in his left ear on January 12, 2009, at which time he was also told he would be scheduled for a follow-up appointment and audiogram. See Compl.7, ECF No. 1; Mot. in Opp'n to Mot. Summ. J. 20, ECF No. 33. Thomas asserts that he has not yet had a follow-up

evaluation and audiogram, and that he has not been released from care for this issue. See Mot. in Opp'n to Mot. Summ. J. 20, ECF No. 33. Thomas has provided evidence that he at least attempted to file the following documents about the ongoing inadequate treatment for his hearing loss: an informal complaint on May 21, 2009,[3] see Additional Ex. 25, ECF No. 7; a grievance on June 3, 2009, see id. at 28; an appeal to the grievance coordinator on June 5, 2009; see id. at 24; an appeal to the Warden on June 11, 2009, see id. at 25; and an appeal to the Regional Director on June 18, 2009, see id. at 29. A reply from the Ombudsman Service Unit indicated that Thomas received a response from the Regional Ombudsman on June 25, 2009, and stated that the Regional Ombudsman's decision is final such that there was no further review available. See id. at 30. Thomas filed the instant complaint on February 17, 2010.[4]

## II. Administrative Exhaustion

In the Motion for Summary Judgment, counsel for the defendant argues that Thomas failed to exhaust his administrative remedies because the grievance that Thomas submitted was not filed within 30 days from the date of the incident. See Mem. in Support 10, ECF No. 20. "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see

---

[3] Thomas states that he never received a response to his informal complaint. Mot. in Opp'n to Mot. Summ. J. 21-23, ECF No. 33

[4] For purposes of calculating the statute of limitations, a pro se pleading is deemed filed when the prisoner delivers his pleading to prison officials. Lewis v. City of Richmond Police Dep't, 947 F.2d 733 (4th Cir. 1991); see also Houston v. Lack, 487 U.S. 266 (1988). The complaint was signed on February 17, 2010. In his Motion in Opposition to Defendant's Motion for Summary Judgment, plaintiff avers that he filed his complaint on February 17, 2010. The Court received the complaint on March 11, 2010. The defendant's statement that Thomas filed his complaint on March 15, 2010 is thus inaccurate. See Mem. in Opp'n to Mot. To Amend 1, ECF No. 30.

5

Woodford v. Ngo, 548 U.S. 81, 92 (2006) (requiring complete exhaustion of correctional facility administrative remedies). Thomas, as a Virginia inmate, was required to exhaust the claims raised in the instant complaint in accordance with the Virginia Department of Corrections ("VDOC") grievance procedures. In particular, he must have complied with VDOC Department Operating Procedure ("DOP") 866, which provides multiple levels of administrative remedies in the form of inmate grievances. Per DOP 866-7.13, an inmate must first attempt to resolve any issues informally. Prison officials must respond to the inmate's complaint within fifteen days of receiving an informal complaint. See DOP 866-7.13. After seeking informal resolution, an inmate may file a regular grievance to the warden or superintendent. The grievance must be filed within thirty days of the underlying incident or occurrence. See DOP 866-7.14. Depending on the subject of the grievance, up to two additional levels of review by higher authorities within VDOC may be available following the filing of a regular grievance. See DOP 866-7.15.

Counsel for the defendant correctly notes that an inmate has not properly exhausted administrative remedies if the grievance that he filed was rejected as untimely even if the inmate appealed that decision through all necessary levels. Id. at 11 (citing Woodford, 548 U.S. at 81). Both parties agree that Thomas filed a grievance on June 3, 2009 regarding the denial of medical care by Dr. Benjamin Ulep, which was rejected as untimely. See Mem. in Support 3, ECF No. 20; Mot. in Opp'n to Mot. Summ. J. 22-23, ECF No. 33. The defendant also asserts that Thomas did not appeal this decision to the Regional Ombudsman within five calendar days as required. See Mem. in Support 4, ECF No. 20. Thomas disagrees with the use of the March 11, 2008 as the date that triggered the thirty day time limit within which he had to file his grievance because that was the date he experienced sudden hearing loss, not the date that Dr. Ulep allegedly

violated his rights through deliberate indifference to his medical needs.[5] See Mot. in Opp'n to Mot. Summ. J. 23-24, ECF No. 33. Additionally, Thomas asserts that he filed all of the required administrative appeals, and that Sussex II never responded to his informal complaint or grievance. See Mot. in Opp'n to Mot. Summ. J. 28, ECF No. 33.

Here, it is clear that the date of the "underlying incident or occurrence" was after March 11, 2008 because Thomas is alleging deliberate indifference to his medical needs through inadequate treatment, and he did not receive any treatment whatsoever until at least March 13, 2008. Furthermore, Thomas complains of Dr. Ulep's failure to follow the MCV Clinic's recommendations, which he could not have grieved until some time had passed after the appointment at MCV on April 9, 2008. In fact, it appears that Thomas did not know the full extent of his injuries until January 12, 2009, when he was first informed that he had permanent hearing loss in his left ear. See Compl.7, ECF No. 1. However, Thomas had been transferred from Sussex II State Prison to Nottoway Correctional Center on January 9, 2009. See Mem. in Support 9, ECF No. 20. Therefore, it remains unclear whether an administrative grievance process was "available" to Thomas within the meaning of § 1997e(a) on the date of the "underlying incident or occurrence."

In Booth v. C.O. Churner, the Supreme Court of the United States held that an inmate must exhaust administrative remedies when "the administrative process has authority to take some action in response to a complaint" even if the inmate seeks monetary damages that are not available through that process. See 532 U.S. 731, 736 (2001). However, the Court noted that

---

[5]Thomas asserts that the appropriate date to use is May 2009, which is the date he was first advised by his family that his condition was serious and he should "make sure he had been getting the proper medical care." See Mot. in Opp'n to Mot. Summ. J. 24, ECF No. 33. He notes that "this was a continuing medical issue..." and argues that none of his claims could have been made until he received his medical file on August 5, 2009. See id. at 25-27.

"[w]ithout the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." See id. at 736 n.4 (nothing that neither party in that case argued that exhaustion is required "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint."). Here, it is unclear whether Sussex II State Prison could have provided any relief to Thomas once he discovered the full extent of his injuries because that discovery only occurred after he had been transferred to Nottoway Correctional Center. Because there is a dispute of material fact as to whether an administrative grievance process was "available" to Thomas within the meaning of § 1997e(a) on the date of the "underlying incident or occurrence," summary judgment on this basis is inappropriate.

### III. Pending Motions

Before the Court are plaintiff's three Motions to Amend (Docket # 13, Docket # 14, and Docket # 26), Motion for Default Judgment (Docket # 24), Motion for Contempt of Court (Docket # 25), and Motion to Dismiss Reply Memorandum (Docket # 35). Counsel for the defendant filed a Memorandum in Opposition to Motion for Default Judgment (Docket # 28), Memorandum in Opposition of Motion for Contempt of Court (Docket # 29), and Memorandum in Opposition of Motion to Amend (Docket # 30), as well as a Motion to Strike plaintiff's response to defendant's reply (Docket # 37).

A. <u>Motions to Amend Filed Before Defendant's Response (Docket # 13 and Docket # 14)</u>

In plaintiff's first Motion to Amend (Docket # 13), he asks to amend his complaint to seek compensatory damages in the amount of $250,000.00. In plaintiff's second Motion to

Amend (Docket # 14), he asks to amend his complaint to clarify that he is suing defendant Benjamin Ulep in both his individual and official capacities. Both of these motions were filed before the defendant a responsive pleading. Under Federal Rule of Civil Procedure 15(a), any party may amend its prior pleading "once as a matter of course at any time before a responsive pleading is served . . . ." Because plaintiff filed his Motion to Amend before defendants filed any response, plaintiff's first two Motions to Amend must be granted as a matter of course.[6]

B. Motion for Default Judgment (Docket # 24), Motion for Contempt of Court (Docket # 25), and Motion to Dismiss Reply (Docket # 35)

Plaintiff also filed a Motion for Default Judgment (Docket # 24), in which he argues that default judgment is appropriate under Federal Rule of Civil Procedure 55 because the defendant waived his reply, and a Motion for Contempt of Court (Docket # 25), in which he argues that he should be awarded monetary damages because the defendant voluntarily waived his reply. In the Motion to Dismiss Reply (Docket # 35), plaintiff argues that the defendant's Reply Memorandum in Further Support of Motion for Summary Judgment (Docket # 32) should be dismissed because the defendant filed a waiver of reply.

In the Memorandum in Opposition to Motion for Default Judgment and Memorandum in Opposition of Motion for Contempt of Court, counsel for the defendant correctly notes that a defendant's decision to waive his reply to a prisoner complaint does not constitute an admission of the allegations in the complaint. See Jones v. Bock, 549 U.S. 199, 213-14 (2007) ("...unlike in the typical civil case, defendants do not have to respond to a complaint covered by the PLRA

---

[6]Notably, counsel for the defendant recognized that the defendant was named in both his official and individual capacities. See Mem. in Support 15, ECF No. 20.

9

until required to do so by the court, and waiving the right to reply does not constitute an admission of the allegations in the complaint.") (citing 42 U.S.C. §§ 1997e(g)(1), (2)). Furthermore, under Local Rule 7(F)(1), the party opposing a motion may file a responsive brief to the motion, after which the moving party is permitted to file a rebuttal brief. Therefore, the Motion for Default Judgment, Motion for Contempt of Court, and Motion to Dismiss Reply will be denied.

C. Motions to Amend Filed After Response (Docket # 26)

Finally, plaintiff filed a third Motion to Amend (Docket # 26), in which he seeks to add the following four individuals as defendants in this action: (1) Ms. Dodson (OTO and employee of MCV Physicians), (2) V. Watkins (Audiologist and employee of MCV Physicians), (3) Nurse D. James (nurse at Sussex II State Prison), and (4) Nurse E. Bynum (nurse at Sussex II State Prison). Plaintiff asserts that Ms. Dodson and V. Watkins did not advise defendant Dr. Benjamin Ulep of their treatment recommendations in a timely manner. Plaintiff states that Nurse James initially denied plaintiff the emergency medical care he needed, and that Nurse Bynum signed the institutional medical chart confirming that she received treatment recommendations from MCV.[7]

In the Memorandum in Opposition of Motion to Amend, counsel for the defendant argues that the Motion to Amend should be denied because the claims against the newly named defendants are barred by the statute of limitations. Plaintiff filed the Motion to Amend on August 4, 2010. Counsel argues that the claims against these defendants arose in March 2008, so

---

[7] Plaintiff asserts that Nurse Bynum's signature is "in contradiction to Dr. Ulep's sworn affidavit." See Motion to Amend 2, ECF No. 26.

that the statute of limitations for these claims expired in March 2010. See Opp'n Mot. to Amend 2, ECF No. 30.

Upon review of the record, it is clear that Thomas's claims against Ms. Dodson and V. Watkins could not have accrued until at least April 9, 2008 because that was his earliest contact with anyone at the MCV Clinic. See Brief in Support 6, ECF No. 20. Likewise, his claim against Nurse Bynum could not have accrued until April 10, 2008, which is when Thomas alleges she signed the institutional medical chart confirming that she received treatment recommendations from MCV. See Mot. to Amend 2, ECF No. 26. Nevertheless, these claims must be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim.[8]

In reviewing a complaint pursuant to § 1915A, a court must dismiss a prisoner complaint that is frivolous, malicious, or fails to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1). Whether a complaint states a claim upon which relief can be granted is determined by "the familiar standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." Sumner v. Tucker, 9 F. Supp. 2d 641, 642 (E.D. Va. 1998). Thus, the alleged facts are presumed true, and the complaint should be dismissed only when "it is clear that no relief could be granted

---

[8] Section 1915A provides:

> (a) **Screening.**—The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
>
> (b) **Grounds for dismissal.**—On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—
> (1) is frivolous, malicious, or fails to state a claim upon which relief can be granted; or
> (2) seeks monetary relief from a defendant who is immune from such relief.

under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, id., and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level...". Twombly, 550 U.S. at 55. Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1949-1950.

Courts may also consider exhibits attached to the complaint. United States ex rel. Constructors, Inc. v. Gulf Ins. Co., 313 F. Supp. 2d 593, 596 (E.D. Va. 2004) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (2d ed.1990), cited with approval in Anheuser-Busch v. Schmoke, 63 F.3d 1305, 1312 (4th Cir.1995)). Moreover, where a conflict exists between "the bare allegations of the complaint and any attached exhibit, the exhibit prevails." Gulf Ins. Co., 313 F. Supp. 2d. at 596 (citing Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir.1991)).

To state a claim of inadequate medical care that rises to the level of a constitutional violation, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105 (1976); see also Staples v. Va. Dep't of Corr., 904 F. Supp. 487, 492 (E.D. Va. 1995). Thus, Thomas must allege

two distinct elements to state a claim upon which relief can be granted. First, he must allege a sufficiently serious medical need. Second, he must allege deliberate indifference to that serious medical need. Under this second prong, an assertion of mere negligence or malpractice is not enough to state an Eighth Amendment violation; instead, plaintiff must allege and demonstrate "[d]eliberate indifference . . . by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Estelle, 429 U.S. at 106. In other words, a plaintiff must allege facts demonstrating that defendant's actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 (citations omitted).

Here, assuming without deciding that Thomas's hearing loss constituted a serious medical need on April 9, 2008, his claims against these defendants fail under the deliberate indifference prong because it is clear that these defendants addressed his hearing loss in a manner that was not "grossly incompetent, inadequate, or excessive as to shock the conscience." Id. To explain his claims against Ms. Dodson and V. Watkins, Thomas merely states that "[t]he two doctors at MCV are involved in not advising Dr. Ulep of their recommendations for treatment in a time frame that would have restored or stabilized plaintiff's hearing." See Mot. to Amend 2, ECF No. 26. These defendants' alleged failure to communicate with Dr. Ulep does not exhibit "actual intent or reckless disregard" because there is no allegation that these defendants knew the Consultation Report had not been sent to Dr. Ulep. In fact, the evidence shows that the doctors at the MCV Clinic performed numerous tests on Thomas and made recommendations to attempt to treat his condition. Therefore, Thomas's allegations reflect, at most, medical negligence; they clearly do not suffice to establish deliberate indifference by either

of these defendants. Accordingly, Thomas has failed to state a claim against Ms. Dodson and V. Watkins.[9]

Thomas also fails to state a claim against Nurse D. James or Nurse E. Bynum. The claims against these nurses are summarized by Thomas as follows: "The two nurses at Sussex II signed charts at critical times. Nurse James initially denied plaintiff emergency medical care and Nurse Bynum sign [sic] the institutional medical chart confirming (in contradiction to Dr. Ulep's sworn affidavit) that she received recommendations from MCV to issue certain specific medical care." See Mot. to Amend 2, ECF No. 26. Again, assuming without deciding that Thomas's hearing loss constituted a serious medical need, his claims against these defendants fail under the deliberate indifference prong because it is clear that these defendants addressed his hearing loss in a manner that was not "grossly incompetent, inadequate, or excessive as to shock the conscience." See Miltier, 896 F.2d at 851. The fact that Nurse James and Nurse Bynam each signed Thomas's medical charts during the course of his treatment does not show that they exhibited "actual intent or reckless disregard" to his medical needs. Rather, Nurse James's immediate response to Thomas's emergency grievance in which she told Thomas to file a sick call request shows that she made an effort to help Thomas to receive the care he was requesting. Similarly, Nurse Bynum's notations on his medical chart demonstrate that she was trying to ensure there was an accurate record of the care that Thomas was receiving. Thomas's allegations reflect, at most, medical negligence; they clearly do not suffice to establish deliberate

---

[9] Notably, the claims against Ms. Dodson and V. Watkins are also subject to dismissal because they are employees of the MCV Clinic and are thus not state actors for purposes of liability under § 1983. Cf. O'Neil v. Anderson, 372 Fed. Appx. 400 (4th Cir. Mar. 29, 2010) (declining to extend Bivens liability to a physician contracted to treat inmates).

14

indifference by either of these defendants. Accordingly, Thomas has failed to state a claim against Ms. Dodson and V. Watkins.

Because Thomas has failed to state a claim against Ms. Dodson, V. Watkins, Nurse D. James, or Nurse E. Bynum, the Motion to Amend will be denied.

D. Defendant's Motion to Strike (Docket # 37)

Counsel for the defendant filed a Motion to Strike plaintiff's response to defendant's reply (Docket # 37) and a Memorandum in Support of that motion. The defendant argues that plaintiff's response should be stricken from the docket as an impermissible pleading under Local Rule 7(F)(1). Specifically, the defendant argues that the response should be stricken because plaintiff had not obtained leave of Court to file the response. In deference to plaintiff's pro se status, the Motion to Strike will be denied.

IV. Summary Judgment Standard of Review

Summary judgment is appropriate where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could . . . return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "When a motion for summary judgment is made and supported . . . [by affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment. Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir. 1994); Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). Where a genuine issue of material fact exists, summary judgment may only be awarded if the court assumes the facts as alleged by the non-moving party. See Moore v. Winebrenner, 927 F.2d 1312, 1313 (4th Cir. 1991) ("In reviewing a grant of summary judgment...we view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party."), cert. denied, 502 U.S. 828 (1991).

## V. Analysis

Thomas argues that defendant Dr. Ulep exhibited deliberate indifference to Thomas's medical needs, in violation of the Eighth Amendment. Specifically, Thomas argues that Dr. Ulep exhibited deliberate indifference by (1) failing to refer Thomas to a specialist on March 13, 2008 despite Dr. Ulep's lack of qualification to diagnose and treat hearing loss, (2) misdiagnosing Thomas's condition on March 13, 2008, resulting in a delay in treatment, (3) failing to order the tests and start the treatment that had been recommended by the MCV Clinic on April 9, 2008. For the reasons that follow, the defendant's Motion for Summary Judgment will be denied.

As explained above, Thomas can only prevail on a claim of constitutionally inadequate medical care if he proves "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 105; see also Staples, 904 F. Supp. at 492. Thus, Thomas must allege (1) a sufficiently serious medical need, and (2) deliberate

indifference to that serious medical need "by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Estelle, 429 U.S. at 106.

The defendant Dr. Ulep argues that summary judgment is appropriate because Thomas has failed to allege sufficient facts to demonstrate that Dr. Ulep exhibited deliberate indifference to his serious medical needs. Dr. Ulep argues that "the plaintiff must prove that this defendant, on a given occasion, failed to provide him with medical care that he knew the plaintiff needed and that such failure constituted a serious deprivation." See Mem. in Support 13, ECF No. 20. He asserts that Thomas has failed to make that showing here because Dr. Ulep treated Thomas to the best of his ability on March 13, 2008, referred Thomas to see a specialist at the MCV Clinic, and followed the recommendations of the MCV Clinic on April 28, 2008, after he had received the Consultation Report. See id. at 14. Dr. Ulep thus concludes that there is no factual basis for Thomas's claims. Id. Dr. Ulep appears to assert that he did not know the recommendations of the MCV Clinic until he received the Consultation Report on April 28, 2008. See id.; Mem. in Support 7, ECF No. 20. Specifically, the defendant makes the following argument:

> "Notwithstanding the fact that Dr. Ulep has provided sworn testimony and corroborating medical records to show that he did not receive the recommendations until 18 days later, the plaintiff points to exhibits 8 and 9 to his Memorandum in Opposition as proving Dr. Ulep received the recommendations on April 10, 2008. The plaintiff's argument is unfounded. The exhibits in fact corroborate Dr. Ulep's assertion that he did not receive the consultation report from the ENT Clinic at MCV on April 10, 2008, despite plaintiff's unsupported theory to the contrary."

See Reply Mem. 2-3, ECF No 32.

Defendant's argument is unpersuasive. Even assuming that Dr. Ulep did not receive the Consultation Report until April 28, Thomas has provided documentary evidence indicating that

17

Dr. Ulep may have known that multiple tests were ordered on April 10, 2008. Specifically, Thomas's medical charts contain a note dated April 10, 2008, which states:

> "Patient seen at ENT 4/09/08 and request for head MRI and mult. labs. Labs received but consult. form left blank. P: P/S contact MCV-ENT Clinic and ask them to fax to us the ENT-MCV consultation report 4/09/08–we will need this to justify mult. test recommended."

See Opp'n to Summ. J.8, ECF No. 33. Furthermore, the response to the informal complaint that Thomas submitted on April 23, 2008 stated "We're not going to order your labs until your other test have [sic] been completed,"and this response was dated April 28, 2008. See Compl.7, ECF No. 1; see also Additional Ex. 10, 13, ECF No. 7.

Despite the evidence that Dr. Ulep knew that tests were ordered as early as April 10, Dr. Ulep did not order the recommended tests or start the course of prednisone until April 28. See Mem. in Support 7, ECF No. 20. Notably, Dr. Ulep has not contested the documents that Thomas has filed concerning Sudden Sensorineural Hearing Loss (SSNHL), which indicate that "[a] delay in treating this condition (2 weeks or more after the symptoms first began) will decrease the chance that medications might improve the hearing loss." See Additional Ex. 19, ECF No. 7. Therefore, if Dr. Ulep knew that multiple tests and a course of prednisone were recommended on April 10, 2008 but did not order the tests or begin the prednisone until April 28, 2008, then Thomas's claim that Dr. Ulep exhibited deliberate indifference to his serious medical needs may have merit. See, e.g., Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) ("...delayed medical treatment can constitute a manifestation of deliberate indifference.") (citing Estelle, 429 U.S. at 104-05). Thus, because there is a dispute as to the material fact of when Dr. Ulep became aware of the treatment recommendations from the MCV Clinic, summary judgment

is inappropriate at this juncture, and the Motion for Summary Judgment will be denied. Therefore, the defendant will be given thirty (30) days to file a supplemental brief addressing whether Dr. Ulep knew the tests and prednisone were ordered as early as April 10, and why the tests and treatment did not begin until April 28.

Entered this 9th day of March 2011.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia