IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Earl Thomas, III,  )
    Plaintiff,  )
  )
v.  )  1:10cv245 (CMH/JFA)
  )
Dr. Benjamin Ulep,  )
    Defendant.  )

FILED SEP 1 3 2011 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

Earl Thomas, III, a Virginia inmate proceeding pro se, filed this action pursuant to 42 U.S.C. § 1983, alleging defendant Dr. Benjamin Ulep violated his rights under the Eighth Amendment through deliberate indifference to his medical needs relating to sudden hearing loss. Defendant filed a Motion for Summary Judgment, arguing that Thomas failed to exhaust his administrative remedies and that the claim of deliberate indifference is without merit. The Motion for Summary Judgment was denied without prejudice by Memorandum Opinion and Order dated March 9, 2011, and defendant was directed to file a responsive pleading within thirty (30) days of the date of that Order. Defendant filed a renewed Motion for Summary Judgment. Thomas was given the opportunity to file responsive materials, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and has filed a response, as well as a Motion for Appointment of Counsel. For the reasons that follow, defendant's Renewed Motion for Summary Judgment will be granted and Thomas's Motion for Appointment of Counsel will be denied as moot.

### I. Background

On March 11, 2008, Earl Thomas, III–then an inmate at Sussex II State Prison–submitted an Emergency Medical Grievance because he had suddenly lost hearing in his left ear, and also

1

had a headache and a fever. See Compl. 6, ECF No. 1. The emergency grievance was rejected because it "did not meet the definition of an emergency," and Thomas was instructed to submit a sick call request. See Compl. 6, ECF No. 1. Thomas sent a sick call request to the medical department on March 13, 2008, and Thomas was seen by Dr. Ulep the next day. See Compl. 7, ECF No. 1. After examining Thomas, Dr. Ulep directed Thomas to take a decongestant and to return for a follow-up appointment on March 24, 2008. See Compl. 7, ECF No. 1.

Thomas submitted another sick call request on March 21, 2008, explaining that his hearing had not improved despite his taking the decongestant that Dr. Ulep had prescribed. See Compl. 7, ECF No. 1. Dr. Ulep saw Thomas on March 24, 2008 for a follow-up appointment. See Compl. 7, ECF No. 1. Thomas asserts that Dr. Ulep did not want to send Thomas to see a specialist to evaluate his hearing loss, so Thomas filed informal complaints against Dr. Ulep. See Compl. 7, ECF No. 1.

Dr. Ulep states that he referred Thomas to a specialist to have his hearing checked on March 24, 2008, at which time Dr. Ulep also submitted a request for a referral form to seek approval to send Thomas to an off-site appointment. See Mem. in Support 6, ECF No. 20. Dr. Ulep received approval for the off-site appointment on March 28, 2008 and directed a member of his administrative staff to arrange an appointment at the Medical College of Virginia otolaryngology clinic ("MCV Clinic"). Thomas was scheduled for an appointment at the MCV Cliniv on April 9, 2008. See Mem. Renewed Mot. at 5, ECF No. 54.

On April 9, Thomas was evaluated by an audiologist and an otorhinolaryngologist at the MCV Clinic, who told Thomas that he had nerve damage in his left ear and needed to be started on a course of steroids. See Compl. 7, ECF No. 1. He also recommended that Thomas undergo blood and urine tests to determine what had caused the damage. See Compl. 7, ECF No. 1.

2

The physician who examined Thomas at the MCV Clinic failed to send back to Dr. Ulep an ENT Consultation Report containing his findings and recommendations for treatment. Specifically, the Consultation form that Dr. Ulep received on April 10 "had no findings, no treatment and medication recommendations, no restrictions or laboratory results listed and was not signed by the consulting physician. The only portion that was filled in by the ENT Clinic was the section entitled 'Follow-Up Appointment' which said 'Pt. [patient] needs MRI & lab work completed prior to f/u [follow-up] visit after.'" See Mem. Renewed Mot. at 5, ECF No. 54. Because Dr. Ulep "needed the form signed by the specialist to obtain authorization to send the plaintiff for a MRI and for any non-formulary tests per protocol at the facility," see id.; see also Ulep Supp. Aff. at 2, ECF No. 54-1, Dr. Ulep directed a member of his administrative staff to contact the MCV Clinic and ask them to fax the report as soon as possible. See Mem. in Support 6, ECF No. 20.

Another Consultation Report was received on April 28, 2008, and it diagnosed Thomas with sudden sensorineural hearing loss. See Mem. Renewed Mot. at 6, ECF No. 54. Thomas has filed documents concerning sudden sensorineural hearing loss (SSNHL), which are apparently written by experts in the field and which indicate that "[a] delay in treating this condition (2 weeks or more after the symptoms first began) will decrease the chance that medications might improve the hearing loss." See Add. Ex. 19, ECF No. 7. The Consultation Report recommended a tapering course of prednisone, as well as multiple blood tests, including complete blood count, rheumatoid profile, and Lyme's Disease test, and a magnetic resonance imaging test ("MRI") of Thomas's left ear, with a follow-up appointment at the MCV Clinic after the MRI was completed. See Mem. in Support 7, ECF No. 20.

3

In the first Motion for Summary Judgment, Dr. Ulep appeared to claim that he did not know that tests were recommended until he received the Consultation Report on April 28, 2008. See Mem. in Support 7, ECF No. 20. However, as Thomas stressed in his Motion in Opposition to Defendant's Motion for Summary Judgment,[1] Thomas's medical charts contain a note dated April 10, 2008, which states:

> "Patient seen at ENT 4/09/08 and request for head MRI and mult. labs. Labs received but consult. form left blank.[2] P: P/S contact MCV-ENT Clinic and ask them to fax to us the ENT-MCV consultation report 4/09/08–we will need this to justify mult. test recommended."

See Opp'n to Summ. J.8, ECF No. 33. In the Supplemental Affidavit of Dr. Benjamin Ulep that was filed in support of the Renewed Motion for Summary Judgment, Dr. Ulep acknowledges that he wrote the April 10 note on Thomas's medical chart. He explains

> On April 10, 2008...I noted [on plaintiff's medical chart] that a "head MRI study and multiple lab studies" had been requested by the ENT clinic, but that the form had been left blank. I needed the form completed with specific treatment recommendations and signed by the specialist to know what lab studies to perform. In addition, I needed the form signed by the specialist to obtain authorization to send the plaintiff for a MRI and for any non-formulary tests per protocol at the facility. At that time, I did not know what tests were recommended except for an MRI which I could not order without the signed Consultation Form or other report from the ENT Clinic. Further, there was no mention of a

---

[1] See Mot. in Opp'n to Mot. Summ. J. 11, ECF No. 33; see also Reply Mem. 14, ECF No. 36 ("A review of Dr. Ulep's statement in plaintiff [sic] medical file on April 10, 2008, Dr. Ulep does not claim to be unaware of the ENT findings and recommendations, he simply wants another document to justify multiple test [sic] recommended.").

[2] Petitioner argues that the "blank" Consultation Form was "un-signed." See Reply Mem. 13, ECF No. 36. Defendant asserts that "Dr. Ulep received these recommendations via a consultation form on [April 28, 2008]...[and w]ithout documentation from plaintiff's specialist, Dr. Ulep would not know what was required and would not be able to order the tests recommended." See Reply Mem. 2, ECF No. 32. Thus, it appears that the recommendations were not provided in documentary form until April 28, but defendant nowhere denies that he received the recommendations in some other form prior to that date.

4

> prednisone taper on the Consultation Form that I received on April 10, 2008 and I did not know that this medication had been recommended.

See Ulep Supp. Aff. at 2, ECF No. 54-1.

Thomas submitted an informal complaint on April 23, 2008, stating that the MCV Clinic had recommended blood work and medication and that he had not received either. See Add. Ex. 13, ECF No. 7. The response, which was dated April 28, 2008, stated, "We're not going to order your labs until your other test have [sic] been completed." See Compl.7, ECF No. 1; see also Add. Ex. 10, ECF No. 7. Regarding this informal complaint, Dr. Ulep provided the following information in the Supplemental Affidavit of Dr. Benjamin Ulep that was filed in support of the Renewed Motion for Summary Judgment:

> With regard to plaintiff's Informal Complaint dated April 23, 2008, and received by the medical department on April 23, 2008, I do not review these complaints, do not answer them and a copy of these complaints are [sic] not included in an inmate's medical chart. In addition, I was never given this complaint and had no knowledge of it.... Because this information was not shared with me, I had no knowledge of what was recommended until I received the ENT report on April 28, 2008.

See Ulep Supp. Aff. at 4, ECF No. 54-1.

Dr. Ulep ordered the recommended tests and started the course of predisone on April 28. See Mem. in Support 7, ECF No. 20. Thomas filed requests on July 2, July 5, and August 4, 2008, all stating that he had not received the medication the MCV Clinic had recommended for his "ear problem" and asking for immediate treatment. See Add. Ex. 22, ECF No. 7. However, Thomas's medical files appear to indicate that he received a steroid taper sometime before October 29, 2008. See Mem. in Support, Ex. at 7, ECF No. 20-5.[3] Numerous tests were performed between April 28 and June 10, including an MRI and blood tests, and the results were

---

[3] Thomas originally claimed that he never received the steroids, see Compl.7, ECF No. 1, but he has not disputed the accuracy of his medical files from October 29, 2008.

5

normal. See Ulep Aff. 4-5, ECF No. 20-4. Dr. Ulep explained the MRI results to Thomas on June 23, 2008 and told Thomas that there was still no explanation for his hearing loss. See Mem. Renewed Mot. at 8, ECF No. 54.

Thomas had a follow-up appointment at the MCV Clinic on October 29, 2008. Dr. Ulep reviewed the report from the physician at the Clinic, which recommended another follow-up appointment in three months. The report also recommended that Thomas be evaluated for a hearing aid. See Mem. Renewed Mot. at 8, ECF No. 54. On October 31, 2008, Dr. Ulep submitted a request for Thomas to have a follow-up appointment at the MCV Clinic and for Thomas to be evaluated for a hearing aid. Dr. Ulep received approval for the follow-up appointment, which was scheduled for January 12, 2009. Id. at 9.

Thomas was transferred from Sussex II State Prison to Nottoway Correctional Center on January 9, 2009, and he has had no contact with Dr. Ulep since his transfer. See id. He was first advised that he had permanent hearing loss in his left ear on January 12, 2009, at which time he was also told he would be scheduled for a follow-up appointment and audiogram. See Compl. 7, ECF No. 1; Mot. in Opp'n to Mot. Summ. J. 20, ECF No. 33. Thomas asserts that he has not yet had a follow-up evaluation and audiogram, and that he has not been released from care for this issue. See Mot. in Opp'n to Mot. Summ. J. 20, ECF No. 33. Thomas has provided evidence that he at least attempted to file the following documents about the ongoing inadequate treatment for his hearing loss: an informal complaint on May 21, 2009,[3] see Additional Ex. 25, ECF No. 7; a grievance on June 3, 2009, see id. at 28; an appeal to the grievance coordinator on June 5, 2009; see id. at 24; an appeal to the Warden on June 11, 2009, see id. at 25; and an appeal to the Regional Director on June 18, 2009, see id. at 29. A reply from the Ombudsman Service Unit

---

[3] Thomas states that he never received a response to his informal complaint. Mot. in Opp'n to Mot. Summ. J. 21-23, ECF No. 33

indicated that Thomas received a response from the Regional Ombudsman on June 25, 2009, and stated that the Regional Ombudsman's decision is final such that there was no further review available. See id. at 30. Thomas filed the instant complaint on February 17, 2010.[4]

### III. Summary Judgment Standard of Review

Summary judgment is appropriate where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could . . . return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "When a motion for summary judgment is made and supported . . . [by affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment. Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir. 1994); Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). Where a genuine issue of material fact exists, summary judgment may only be awarded if the court assumes the facts as alleged by the non-moving party. See Moore v. Winebrenner, 927 F.2d 1312, 1313 (4th Cir. 1991) ("In reviewing a grant of summary judgment...we view the inferences to be drawn from

---

[4] For purposes of calculating the statute of limitations, a pro se pleading is deemed filed when the prisoner delivers his pleading to prison officials. Lewis v. City of Richmond Police Dep't, 947 F.2d 733 (4th Cir. 1991); see also Houston v. Lack, 487 U.S. 266 (1988). The complaint was signed on February 17, 2010. In his Motion in Opposition to Defendant's Motion for Summary Judgment, plaintiff avers that he filed his complaint on February 17, 2010. The Court received the complaint on March 11, 2010. The defendant's statement that Thomas filed his complaint on March 15, 2010 is thus inaccurate. See Mem. in Opp'n to Mot. To Amend 1, ECF No. 30.

the underlying facts in the light most favorable to the nonmoving party."), cert. denied, 502 U.S. 828 (1991).

## IV. Analysis

Thomas argues that defendant Dr. Ulep exhibited deliberate indifference to Thomas's medical needs, in violation of the Eighth Amendment. Specifically, Thomas argues that Dr. Ulep exhibited deliberate indifference by (1) failing to refer Thomas to a specialist on March 13, 2008 despite Dr. Ulep's lack of qualification to diagnose and treat hearing loss, (2) misdiagnosing Thomas's condition on March 13, 2008, resulting in a delay in treatment, (3) failing to order the tests and start the treatment that had been recommended by the MCV Clinic on April 9, 2008. For the reasons that follow, the defendant's Renewed Motion for Summary Judgment will be granted.

To state a claim of inadequate medical care that rises to the level of a constitutional violation, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105 (1976); see also Staples v. Va. Dep't of Corr., 904 F. Supp. 487, 492 (E.D. Va. 1995). Thus, Thomas must allege two distinct elements to state a claim upon which relief can be granted. First, he must allege a sufficiently serious medical need. Second, he must allege deliberate indifference to that serious medical need. Under this second prong, an assertion of mere negligence or malpractice is not enough to state an Eighth Amendment violation; instead, plaintiff must allege and demonstrate "[d]eliberate indifference . . . by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Estelle, 429 U.S. at 106. In other words, a plaintiff must allege facts demonstrating that defendant's actions were "[s]o grossly incompetent, inadequate,

or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 (citations omitted).

Assuming without deciding that Thomas's hearing loss constituted a serious medical need,[4] his claims against defendant Dr. Ulep fail under the deliberate indifference prong because Dr. Ulep addressed his hearing loss in a manner that was not "grossly incompetent, inadequate, or excessive as to shock the conscience." Id. Thomas may disagree with Dr. Ulep's decision to treat Thomas with a decongestant on March 13, 2008, but this decision does not show that Dr. Ulep treated Thomas with "actual intent or reckless disregard." See Miltier, 896 F.2d at 851. The delay in treatment is also insufficient to show that Dr. Ulep displayed deliberate indifference because Dr. Ulep "needed the form signed by the specialist to obtain authorization to send the plaintiff for a MRI and for any non-formulary tests per protocol at the facility." See Mem. Renewed Mot. at 5, ECF No. 54; see also Ulep Supp. Aff. at 2, ECF No. 54-1. Even if Dr. Ulep knew that Thomas needed multiple tests as early as April 10, he could not have ordered these tests until he received the signed, completed Consultation form on August 28. There is also no evidence that suggests that Dr. Ulep knew the other doctors had ordered a tapering dose of prednisone before April 28. Although the justification for the delay between April 10 (when Dr. Ulep realized that the Consultation form he received was unsigned and did not contain the information he needed) and April 28 (when he received the signed and completed form) remains unclear,[5] this delay in treatment allegations reflect, at most, medical negligence; it does not

---

[4] Notably, Dr. Ulep has not contested the documents that Thomas has filed concerning Sudden Sensorineural Hearing Loss (SSNHL), which indicate that "[a] delay in treating this condition (2 weeks or more after the symptoms first began) will decrease the chance that medications might improve the hearing loss." See Additional Ex. 19, ECF No. 7.

[5] Dr. Ulep states that on April 10, he directed a member of his administrative staff to contact the MCV Clinic and have them fax the form to him as soon as possible. See Ulep Aff. at 3-4, ECF No. 20-4. There is no evidence as to when the staff member contacted the MCV Clinic.

9

suffice to establish deliberate indifference by Dr. Ulep. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (noting that an inmate's disagreement over the course of his treatment does not state a cause of action).

## V. Conclusion

Accordingly, defendant's Motion for Summary Judgment will be granted.[6] An appropriate Order and judgment shall issue.

Entered this 13th day of Sept. 2011.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia

---

[6] In deference to plaintiff's pro se status, he is hereby advised that this dismissal does not preclude him from seeking relief in an action for medical malpractice in state courts should he wish to do so.